IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| PETER HARPUR,<br>Petitioner,<br><br>v.<br><br>KATHRYN LOVELAND,<br>Respondent. | Civil Action No. 3:26CV295 (RCY) |

**MEMORANDUM OPINION**

This matter arises from Peter Harpur's ("Petitioner") Petition alleging that Kathryn Loveland ("Respondent") violated the Hague Convention on Civil Aspects of Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501 (the "Hague Convention"), by taking the parties' minor child, LH, to live in the United States. The case is presently before the Court on its own initiative and pursuant to Federal Rule of Civil Procedure 56(f)(3), which permits the Court to issue summary judgment *sua sponte*. The matter has been fully briefed, the parties have been afforded the requisite notice contemplated under Rule 56(f)(3), and the Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. E.D. Va. Loc. Civ. R. 7(J); Fed. R. Civ. P. 78. For the reasons stated below, the Court will grant summary judgment in favor of Petitioner and order the prompt return of LH to New Zealand, for an appropriate local court to render an ultimate custodial decision.

**I. BACKGROUND**

Courts are required to adjudicate petitions filed pursuant to the Hague Convention (hereinafter, "Hague Petitions") with all deliberate speed. Hague Convention arts. 2, 11; *see also* *Monasky v. Taglieri*, 589 U.S. 68, 83 (2020) (noting that Hague Convention proceedings are to be

decided "expeditiously").[1] To achieve this end, courts may, in appropriate cases, resolve Hague Petitions "without resorting to a full trial on the merits or a plenary evidentiary hearing." *March v. Levine*, 249 F.3d 462, 474 (6th Cir. 2001); *see also West v. Dobrev*, 735 F.3d 921, 931–32 (10th Cir. 2013) (upholding Hague Petition adjudication based solely on pleadings and elucidations of the same at a preliminary hearing, rejecting respondent's proposition that he was entitled to an evidentiary hearing). Relatedly, courts may, in appropriate cases, adjudicate Hague Petitions by entering summary judgment *sua sponte*. *See Menechem v. Frydman-Menachem*, 240 F. Supp. 437, 444 (D. Md. Jan. 14, 2003) (entering summary judgement *sua sponte* because "an evidentiary hearing would simply serve to rehash all the issues already presented and would not provide the Court with any additionally helpful or probative evidence"). This case is of that latter nature, and the Court therefore finds it proper to enter *sua sponte* summary judgment pursuant to Federal Rule of Civil Procedure 56(f)(3).

Under that Rule, "[a]fter giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). On July 21, 2026, the Court issued an order providing the requisite notice. R. 56 Order, ECF No. 34. Therein, the Court invited the parties to respond to its order by "identifying any material facts they contend are genuinely disputed (including, but not limited to, the facts identified by the Court), with citations to the existing record, or by submitting supplemental materials." *Id.* at 2 (cleaned up).

Based on the parties' submissions in response and the record as a whole, the Court finds that Petitioner is entitled to summary judgment. The Court reaches this conclusion even after

[1] While the Convention calls for adjudication in only six weeks, "[t]he reality is that, on average, U.S. trial courts take substantially longer to resolve Convection cases"—typically around six months. J. Garbolino, Fed. Jud. Ctr., The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 226 (3d ed. 2023)) (hereinafter, "Hague Convention Guide").

construing the record and all competing rational inferences in Respondent's favor—the usual summary judgment standard—because no genuine dispute remains that would warrant an evidentiary hearing rather than summary disposition. *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986); *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

**A. Procedural History**

On April 1, 2026, Petitioner filed the instant Hague Petition in the Chesterfield County Juvenile and Domestic Relations Court. Pet., ECF No. 1-1. Respondent removed the Petition to this Court on April 10, 2026, Not. Removal, ECF No. 1, and filed an Answer thereto on May 8, 2026, Answer, ECF No. 5. Attached to Respondent's Answer is a listing of the residences for LH from birth through May 8, 2026, Answer Ex. A ("LH Residence Table"), ECF No. 5-1, and a record of a domestic incident that occurred on July 18, 2025, Answer Ex. B ("Police Report"), ECF No. 5-2.

On May 21, 2026, the parties appeared before the undersigned for an initial pretrial conference. ECF No. 9. Following that hearing, the Court ordered the parties to submit briefing on the issues raised in the Petition and Answer along with a joint submission setting forth any stipulated facts. ECF No. 11. On June 12, 2026, Petitioner filed his brief and attendant evidentiary exhibits. Mem. Supp. Pet., ECF No. 22. These exhibits include an excerpt of text messages between the parties. Authenticated Text Messages, ECF No. 22-3. Then, on June 15, 2026, the parties filed a Joint Submission of Stipulated Facts. Stip. Undisp. Facts ("SUF"), ECF No. 30.[2] Respondent filed her Opposition to Petitioner's Memorandum, along with attendant evidentiary submissions, on June 22, 2026. Resp't's Opp'n, ECF No. 32. Petitioner filed his Reply in Support and attendant evidentiary submissions on June 29, 2026. Pet'r's Reply, ECF No. 33.

[2] Therein, the parties stipulate to the authenticity of the Authenticated Text Messages. SUF ¶ 17.

After reviewing the parties' submissions, the Court issued its Rule 56 Notice Order directing the parties to "identify[] any material facts they contend are genuinely disputed (including, but not limited to, the facts identified by the Court), with citations to the existing record, or by submitting supplemental materials." Rule 56 Order 2 (internal citation omitted). The parties obliged and submitted their responses on August 7, 2026: Respondent filed "Supplemental Briefing" opposing summary judgment, ECF No. 38, and Petitioner filed "Plaintiff's Response Per the Court's Memorandum Order of July 21, 2026" (hereinafter, "Petitioner's Response in Support of Summary Judgment"), ECF No. 39. Respondent thereafter sought leave to file an amended version of her opposition, accompanied by various non-electronic exhibits, ECF No. 41, and further moved to file an additional supplemental brief, ECF No. 43, while Petitioner requested leave to file a response to Respondent's supplements, ECF No. 45. The Court accepted all supplements and amendments, *see* Order, ECF No. 48, rendering the operative supplemental briefing landscape as follows: Respondent's amended Supplemental Briefing (hereinafter, "Respondent's Summary Judgment Opposition"), ECF No. 41-1; Respondent's Second Supplemental Briefing (hereinafter, "Respondent's Supplemental Opposition"), ECF No. 43-1; and Petitioner's corrected Response to Respondent's Supplemental Briefing (hereinafter, "Petitioner's Supplemental Response"), ECF No. 47.

Having thus established the record, the following recitation reflects the undisputed facts—together with any immaterial, disputed facts construed in Respondent's favor—for the purpose of issuing summary judgment:

**B. Relevant Facts**

1. <u>General Factual Background</u>

Petitioner is a citizen of New Zealand. SUF ¶ 1. Respondent is a citizen of the United States and holds a New Zealand permanent resident visa. *Id.* ¶ 2. The parties were married on

October 19, 2018. *Id.* ¶ 4. They share one minor child, LH. *Id.* ¶ 5. LH was born in New Zealand in 2022. *Id.*; *see also* Rule 56 Order 2. Petitioner and Respondent have been maritally separated since April 2024, though they remain married at present. *Id.* ¶¶ 4, 7. Petitioner resided outside the marital home from September 2024 through April 2025, at one point residing in Australia for work-related reasons, but he returned to reside in the marital home (marital separation notwithstanding) from April 2025 through July 2025. Rule 56 Order 2. During the period of non-cohabitation, Petitioner visited LH at the family home in New Zealand, and LH (along with Respondent) visited Petitioner in Australia. *Id*. Respondent and LH traveled to the United States on July 20, 2025, and have remained in the United States since. SUF ¶ 11.

On four separate occasions between his birth and July 20, 2025, LH traveled with at least one parent to the United States; each trip varied in duration. *See* LH Residence Table. LH has spent approximately 742 days in New Zealand and approximately 201 days in the United States. *Id.* LH spent the entirety of his time in New Zealand at the same residence, whereas LH's time spent in the United States was divided between three separate residences in two different states. *Id.* (noting LH spent roughly three months in Manteo, NC; two months in Kitty Hawk, NC; and four months in Midlothian, VA).

On July 18, 2025, two days prior to LH's most recent July 20, 2025 United States trip, there was a disturbance at the parties' New Zealand home. *See* Loveland Aff. ¶¶ 50–58, ECF No. 32-1. During a car ride to the parties' home, Petitioner expressed suicidal ideations in front of LH. *Id.* ¶ 50. Upon arriving home, the situation escalated. *Id.* ¶ 53. Petitioner became irate, refused to calm down, and would not allow Respondent and LH to leave the home. *Id.* ¶¶ 53–57. Respondent contacted Petitioner's family, a neighbor, and law enforcement for assistance. *Id.* With police assistance, Respondent was able to leave and stay with a friend. *Id.* ¶ 58. Law

enforcement did not find the situation to warrant the issuance of a protective order. Police Report, ECF No. 5-2.[3]

The next day, the parties traveled to Petitioner's parents' house. *Id.* ¶¶ 59–62. Respondent informed Petitioner's mother that she would return to New Zealand with LH after her then-upcoming trip to the United States. *Id.* ¶ 60; *see also* SUF ¶¶ 11–12 (explaining that Respondent informed both Petitioner and his mother that she would return LH to New Zealand in about three weeks). The following day, on July 20, 2025, Petitioner drove Respondent and LH to the airport for their travel to the United States. Loveland Aff. ¶ 65.

On July 27, 2025, one week after leaving New Zealand, Respondent communicated to Petitioner that she desired to remain in the United States. *E.g.*, ECF No. 22-3 at 1 ("I want to live on this side of the world"); *see also id.* ("Are you going to let me live over here?"). Petitioner responded by suggesting Respondent extend the trip for longer than three weeks, explaining that he was busy with work for the next month and therefore did not oppose LH remaining in the United States beyond three weeks. *Id.* at 3.

A few weeks later, on August 15, 2025, Respondent floated the idea of enrolling LH in daycare and finding an apartment. *Id.* at 5–7. Petitioner squarely rejected the idea at first. *Id.* at 7 (responding "NO NONONONO" and asking Respondent to "please book a flight" back to New Zealand). Nonetheless, Petitioner visited Respondent in September 2025, during which time the family explored Richmond, traveled to a local public elementary school, and scouted homes for sale near that school. Suppl. Loveland Aff. ¶¶ 20–21, ECF No. 38-1. Petitioner also brought some

[3] The Court takes judicial notice of the fact that New Zealand police may issue protective orders without input from involved persons. *See* https://www.police.govt.nz/advice-services/family-violence-help-and-support/police-safety-orders [https://perma.cc/KM75-PTMZ] ("The Police do not need consent to issue a [protective order]").

of LH's and Respondent's belongings with him from New Zealand. *Id.* ¶ 21. Petitioner also toured a preschool and met with its teachers. *Id.* ¶ 25.

Shortly thereafter, on October 9, 2025, Petitioner assented to Respondent's request to enroll LH into daycare and move into an apartment. ECF No. 22-3 at 17; *see also* SUF ¶ 13. In doing so, however, Petitioner made clear that the extended stay was "only a 'trial period'" and that he did "not consent to the permanent relocation of LH to the United States." ECF No. 22-3 at 17. Relatedly, Petitioner directed Respondent to "ensure" her lease was "the shortest" available—ultimately agreeing to a lease of up to nine months. *Id.* Around the same time, Petitioner, with Respondent's knowledge, vacated the New Zealand home and relocated to Australia. SUF ¶ 14; *see also* Loveland Suppl. Aff. ¶¶ 32–38. A few days later, on October 13, 2025, Petitioner stated that the parties needed to discuss custody plans. ECF No. 22-3 at 20. In that same vein, on November 17, 2025, Petitioner expresses a desire "to get an agreement in place" for custody rights. *Id.* at 24.

Nonetheless, on November 24, 2025, after Respondent asked whether Petitioner would pay child support, Petitioner demanded that LH return and reiterated that he did not agree to permanent relocation. *Id.* at 24–25. From that point onward, Petitioner remained steadfast in his desire for LH to return to New Zealand. *E.g.*, *id.* at 34 (January 12, 2026 text message, wherein Petitioner states that "[y]our time in the United States was agreed as temporary, with the lease ending on 20 April 2026. I think it's important that we now make clear arrangements for your return to New Zealand in April so we can work through everything properly and respectfully"). Soon thereafter, on January 22, 2026, Respondent commenced custody proceedings in Chesterfield County's Juvenile and Domestic Relations Court. Resp't's Opp'n 7 (citing Loveland Aff. ¶ 79).

2. Petitioner's Temper, Demeanor, Mental Health & Suicidal Ideation

Construing all disputed facts as to Petitioner's temperament, mental health and suicidal ideation in Respondent's favor, the record reflects that Petitioner has, on multiple occasions, resorted to throwing furniture and shouting when he is upset or intoxicated. Loveland Suppl. Aff. ¶¶ 72, 101, 103. These temper tantrums occur with frequency because Petitioner is easily agitated. *E.g.*, Loveland Suppl. Aff. ¶ 76. Petitioner also exhibits controlling behavior in the form of prohibiting Respondent to leave with LH on at least two separate occasions. *Id.* ¶ 77.

Moreover, Petitioner exhibits "coercive control" in the form of withholding money from Respondent, *e.g.*, *id.* ¶ 43, and criticizing her appearance, *id.* ¶ 84. Finally, as described above in connection with the July 18, 2025 incident, and on at least two other occasions, Petitioner has expressed suicidal ideations in front of LH. *Id.* ¶ 102. Nevertheless, "[t]here has been no physical violence between the parties or with their child." SUF ¶ 16.

## II. STANDARD OF REVIEW

Under Rule 56, "[a]fter giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f). The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The parties need not concur on all facts; summary judgment is appropriate so long as there is "no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis added). A material fact is one that might affect the outcome of a party's case. *Id*. at 248. A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to party against whom summary judgment is to be entered, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Id.*

Furthermore, to overcome summary judgment, the party against whom summary judgment is to be entered must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or the "mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (citations omitted); *Anderson*, 477 U.S. at 252. "[T]he quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "Thus, if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment." *Id.* (cleaned up).

## III. DISCUSSION

"To address 'the problem of international child abductions during domestic disputes,' in 1980 the Hague Conference on Private International Law adopted the Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention), T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11 (Treaty Doc.)." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)).[4] "The United States ratified the Hague Convention in 1988, and Congress implemented the Convention that same year through the International Child Abduction Remedies Act (ICARA)." *Id.* at 6 (citing 22 U.S.C. §§ 9001, *et seq.*). ICARA mandates that courts "shall decide" cases "in accordance with the Convention." 22 U.S.C. § 9003(d).

"A primary aim of the Convention is to deter parents from taking children across international boundaries in search of a more sympathetic court to resolve custody disputes." *Alcala v. Hernandez*, 826 F.3d 161, 169 (4th Cir. 2016). The Convention's principal mechanism is the

[4] Both the United States and New Zealand are signatories. *See* Hague Conference on Private Int'l Law, convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.

"return remedy," which generally requires the prompt return of a child (under the age of 16) wrongfully removed from his or her country of habitual residence. *Id.* (citing *Abbott*, 560 U.S. at 9). "Importantly, the return remedy does not alter the pre-existing allocation of custody rights between parents; the Convention generally leaves ultimate custodial decisions to the courts of the country of habitual residence." *Id.* (citing *Abbott*, 560 U.S. at 9). Accordingly, "[t]he merits of any underlying custody case are not at issue." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001); *see also Hundur v. Hundur*, 2026 WL 1004262, at *4 (E.D. Va. Apr. 14, 2026) ("The Convention aims not to settle international custody disputes 'but rather to ensure that cases are heard in the proper court.'" (quoting *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005))).

Anchored by this legal backdrop, to state *a prima facie* case for return of the child, Petitioner must establish, by a preponderance of the evidence, that LH was "wrongfully removed or retained [from New Zealand] within the meaning of the [Hague] Convention." 22 U.S.C. § 9003(e)(1)(A). "A petitioner can establish that the removal [or retention] of a child was 'wrongful' where: (1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal [or retention], (2) the removal [or retention] was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal [or retention]." *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) (quoting *Humphrey v. Humphrey*, 434 F.3d 243, 246 (4th Cir. 2006)).[5]

[5] The only element challenged in the instant case is whether LH was habitually resident in New Zealand at the time he was removed to the United States. Originally, Respondent took the stance that each of the "wrongful[] remov[al]" elements were lacking, including the requirement that Petitioner possess and exercise custody rights as of the alleged date of removal or retention. Answer ¶ 22. But subsequent briefing makes clear that Respondent's challenge is limited to the habitual residence element. *See generally* ECF Nos. 32, 41. And, in any event, the record reveals that Petitioner did in fact possess custody rights. The Court looks to "the State in which the child was habitually resident immediately before the removal or retention" to ascertain whether a petitioner has custody rights. Hague Convention art. 3(a). Here, and as discussed in further detail herein, that State is New Zealand. Under New Zealand law, namely, the Care of Children Act 2004, Petitioner has custody rights because he is LH's father, his name appears on LH's birth certificate, and the couple was married before LH's birth. SUF ¶¶ 4–6. Further, the record certainly

Separately, however, even if Petitioner establishes a *prima facie* case, "[t]he return remedy is not absolute." *Lozano*, 572 U.S. at 5. "Upon a showing of wrongful removal, return of the child is required unless the respondent establishes one of four defenses." *Bader*, 484 F.3d at 668 (quoting *Miller*, 240 F.3d at 398). There are four relevant defenses under the Hague Convention:

> Two of the defenses must be supported by clear and convincing evidence: (1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place the child in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms." *Miller*, 240 F.3d at 398. The other two defenses may be supported by a preponderance of the evidence: (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country, and (2) that the petitioner was not actually exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal. *Id.* at 399.

*Id.* at 668–69 (cleaned up). These defenses "are limited and narrow." *Padilla v. Troxell*, 850 F.3d 168, 175 (4th Cir. 2017) (citing *Alcala*, 826 F.3d at 169).

In the instant case, Respondent raises consent, acquiescence, and grave risk defenses. ECF No. 32 at 7–10, 13–14; *see also* ECF No. 41 at 30–34. Accordingly, the issues before the Court are as follows: (1) whether LH habitually resided in New Zealand or the United States prior to his removal to the United States; (2) whether Petitioner (i) consented to or (ii) acquiesced in LH's permanent removal to the United States; and (3) whether LH's return to New Zealand would expose him to grave risk of physical or psychological harm or otherwise place him in an intolerable situation. The Court addresses these issues in turn, ultimately concluding that LH habitually resided in New Zealand residence prior to being removed to the United States; Petitioner did not consent to or acquiesce in LH's permanent removal to the United States; and returning LH to New

---

reflects that Petitioner was exercising his custodial rights through and beyond the alleged wrongful removal date of July 20, 2025.

Zealand does not expose LH to grave risk of physical harm, psychological harm, or an otherwise intolerable situation.

**A. Petitioner States a Prima Facie Case under the Hague Convention**

As explained *supra*, the lone element at issue is whether LH was habitually resident in New Zealand at the time of the alleged removal or retention. Thus, the Court's analysis is two-pronged: it must first identify the precise date LH was removed or retained and then assess whether LH was habitually resident in New Zealand as of that operative date. The operative date is critical to the Court's assessment, because the habitual residence analysis is cabined by that time. *Miller*, 240 F.3d at 400 ("A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. **The court must look back in time, not forward**." (emphasis added) (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993)). Accordingly, courts do not "look to the parties' later actions" after the alleged wrongful retention or removal "to determine [a child's] habituate residence at the time of [the same]." *Schwaneberg v. Lopez*, 2024 WL 5010144, at *17 (E.D. Va. Dec. 6, 2024).

1. <u>The Operative Date is July 20, 2025—the date LH was Removed to the United States</u>

As an initial matter, removal and retention are fundamentally distinct. Wrongful removal typically "involves a parent unilaterally taking children from the habitual residence without the knowledge or permission of the left-behind parent." Hague Convention Guide 37. In such cases, the operative date is generally straightforward: the date of child is taken from the home without permission. Conversely, wrongful retention cases "frequently involve a party leaving the child's habitual residence with the child for an agreed-upon visit or vacation in another country" with "the traveling party refus[ing] to return the child according to the previous agreement[.]" *Id.* at 37 (citing *Palencia v. Perez*, 921 F.3d 1333, 1342–43 (11th Cir. 2019)); *see also Schwaneberg*, 2024 WL 5010144, at *14, n.4 (finding wrongful retention occurred the moment that the traveling parent

failed to return on the agreed-upon date). Deciphering the operative date in wrongful retention cases therefore prompts a more nuanced review:

> Generally, the date of an unlawful retention is either (1) the date when the child remains with the abducting parent despite the clearly communicated desire of the left-behind parent to have the child returned, or (2) when the acts of the abducting parent are so unambiguous that the left-behind parent knows, or should know, that the child will not be returned.

Hague Convention Guide 38 (cleaned up) (collecting cases).

In the instant case, Petitioner alleges that Respondent unlawfully retained LH in the United States since on or about July 20, 2025 (the date LH was removed to the United States). Compl. ¶ 21. Ostensibly fatal to this allegation is the fact that Petitioner agreed to LH's United States trip for a term of three weeks, SUF ¶¶ 11–12, subsequently permitted Respondent to remain for at least one additional month, ECF No. 22-3 at 2 ("If it makes you feel better, I'm happy to discuss and am thinking maybe can be a longer trip than 3 weeks. I'm just going to be working on this transaction for the next month."), and once more authorized LH to remain in the United States for up to an additional nine months, *id.* at 17.[6] Under such circumstances, Respondent's travel with LH to the United States on July 20, 2025, would normally not be considered wrongful, as it was done with Petitioner's permission.

That said, notwithstanding the parties' purported agreement, Respondent brazenly represents that the moment she moved to the United States on July 20, 2025, "she had the intention of relocating along with LH permanently[.]" ECF No. 32 at 12.[7] Respondent's own unequivocal

[6] In consenting to LH's extended stay in the United States, Petitioner made clear that he was comfortable with six months and the option to extend for two to three months, but nonetheless avowed that "[t]his is only a 'trial period' for me, as I do not consent to the permanent relocation of LH to the United States. I do not consent." ECF No. 22-3 at 17.

[7] Based on this representation, the Court put Respondent on notice in its Rule 56(f)(3) Order that "the record reflects that before departing New Zealand with LH, [Respondent] represented to [Petitioner] that the trip to the United States would last approximately three weeks and that she and LH would return to New Zealand, and that she now contends she intended to remain in the United States at the time she departed New Zealand." ECF No. 34 at 2–3. The Court invited Respondent to dispute its understanding, whether by citing materials on the record or supplementing the

intention therefore makes clear that she wrongfully removed LH to the United States on July 20, 2025, and that date is therefore operative for assessing LH's habitual residence.

2. LH Habitually Resided in New Zealand Prior to July 20, 2025

Having identified July 20, 2025, as the operative wrongful removal date, the Court considered LH's habitual residence immediately before his removal. Habitual residence "depends on the totality of the circumstances specific to the case." *Monasky*, 589 U.S. at 71. "Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78 (cleaned up). "[S]ome cases will be straightforward: Where a child has lived in one place with [their] family indefinitely, that place is likely to be [their] habitual residence." *Id.* Moreover, "[f]or older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Id.*

When assessing the habitual residence of younger children, "the intentions and circumstances of caregiving parents are relevant considerations"—though not dispositive. *Id.* Courts have considered the following factors when assessing parental intent:

> parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence.

*Maxwell v*, 588 F.3d 245, 252 (4th Cir. 2009) (collecting cases).

---

record. *Id.* at 3. Respondent did not answer that call. *See generally* ECF No. 41. Accordingly, the Court's analysis proceeds based on the undisputed fact that Respondent intended to permanently remove LH to the United States on July 20, 2025.

Respondent contends that, as of July 20, 2025, the United States—and not New Zealand—was LH's habitual residence, meaning LH's subsequent relocation to the United States was not "wrongful." ECF No. 32 at 10–13. The Court disagrees.

As an initial matter, Respondent's argument is premised on the two-step habitual residence framework provided in *Maxwell v. Maxwell*, 588 F.3d 245 (4th Cir. 2009). ECF No. 32 at 11. Ten years after *Maxwell*, however, the Supreme Court in *Monasky v. Taglieri* "clarif[ied] the standard for habitual residence," and in doing so rejected the notion that habitual residence could be reduced to a simplified test and instead implored courts to consider all revenant considerations. 589 U.S. at 78–79. While parental intent and acclimation (at least for children capable of acclimating) informs the Court's inquiry, neither controls it; instead, the totality of the circumstances govern.

Anchored by this legal framework, the Court finds that New Zealand was LH's habitual residence as of July 20, 2025. First and foremost, LH was born in New Zealand and primarily resided there in the parties' marital home until the alleged wrongful removal on July 20, 2025, as evidenced by Respondent's own accounting that LH spent approximately 742 days in New Zealand and approximately 201 days in the United States through July 20, 2025. Answer Ex. 1 (table depicting LH's address history through July 20, 2025). The duration of LH's residence in New Zealand—while not dispositive, *see Monasky*, 589 U.S. at 81—certainly informs the Court's assessment. Such is true especially where, as here, Respondent represents that LH spent the entirety of his time in New Zealand at the same residence, whereas LH's time spent in the United States is divided between three separate residences in two different states. Answer Ex. 1 (noting LH spent roughly three months in Manteo, NC; two months in Kitty Hawk, NC; and four months in Midlothian, VA). Those facts establish more than physical presence; they speak directly to the stability, continuity and settled character of LH's life in New Zealand. Thus, not only did LH spend considerably more time in New Zealand, but the nature of that time also reflects permanence,

whereas the nature of LH's time in the United States appears geographically fragmented and provisional.

Respondent argues that, notwithstanding LH's time in New Zealand, the parties had a "shared intent to make the United States their home[] on a level no less than New Zealand." ECF No. 32 at 12. In support, she relies on the parties' purchase of a North Carolina property in 2022 (and their intentions to spend summer months therein), earlier living arrangements in the United States, Petitioner's (failed) efforts to obtain a green card, the parties' opening of a bank account in Hawaii, and certain post-removal conduct. ECF No. 38 at 2–3. These facts, however, while evidence of aspiration, do not establish that the United States was yet LH's habitual residence by July 20, 2025.

The North Carolina residence, for example, was not treated as the family's primary home. Respondent herself describes a plan to reserve the property during the "summer months," while otherwise renting it to others. ECF No. 38 at 2. That arrangement is more consistent with a vacation or seasonal residence than a settled family home. Likewise, Petitioner's unsuccessful effort to obtain a green card in 2024 may demonstrate an interest in living in the United States at some point, but it says little about where LH was actually at home in July 2025. And the parties' earlier decision to open a bank account in Hawaii because Petitioner hoped to spend "heaps of time" there reflects, at most, a possible future connection to the United States—not a concrete decision to relocate LH there. *See Schwaneberg*, 2024 WL 5010144, at *17 (holding that general discussions of relocation are insufficient to alter a child's habitual residence unless they are followed by "concrete action signaling continued intent" contemporaneous with the removal or retention). And, even if the Court were convinced that this isolated act manifested a shared intention to relocate to Hawaii, the Court struggles to ascertain how that intention bears on LH's subsequent removal to Virginia.

Indeed, Respondent's own formulation reveals the flaws of her position. She asserts that Petitioner had a "connection and intention to live in the United States permanently **one day**." ECF No. 41-1 at 3 (emphasis added). An intention to relocate "one day" is not an intention that LH had already relocated by July 20, 2025. Habitual residence turns on the child's circumstances and parental intent at the time of removal—not on a parent's contingent plans for the future. Respondent cannot unilaterally accelerate a contemplated future move by permanently relocating before Petitioner agreed to make that move.

Petitioner's post-removal relocation to Australia is immaterial. Habitual residence is assessed immediately before removal or retention, *Miller*, 240 F.3d at 400 ("The court must look back in time, not forward." (internal quotations omitted)); later events cannot retroactively change where LH habitually resided prior to July 20, 2025. *Schwaneberg*, 2024 WL 5010144, at *17 ("[T]he court will not look to the parties' later actions to determine [the child's] habitual residence at the time of retention. . . . Whether the parents subsequently moved permanently outside of [the child's habitual residence post-removal or -retention] does not concern the [child's] habitual residence at the time of retention."). This conclusion is reinforced by the Hague Convention itself:

> The Convention does not technically require that the child be returned to his or her State of habitual residence, although in the classic abduction case this will occur. If the petitioner has moved from the child's State of habitual residence the child will be returned to the petitioner, not the State of habitual residence.

Hague Convention Guide 207, n.1124 (internal quotations omitted).

Taken together, the balance of the record points decisively to New Zealand as LH's habitual residence at the critical time. Before July 20, 2025, LH had spent most of his life there, his life was anchored to a single residence, his visits to the United States were temporary and dispersed, and the parties had taken no close-in-time steps demonstrating that LH's home had shifted or was about to shift permanently to the United States. Whatever plans the parties may

have entertained about living in the United States someday, those plans had not materialized by the operative date of July 20, 2025.

Accordingly, the Court finds that LH was habitually resident in New Zealand immediately before his removal to the United States on July 20, 2025. Petitioner therefore establishes a prima facie case that LH was "wrongfully removed or retained [from New Zealand] within the meaning of the [Hague] Convention." 22 U.S.C. § 9003(e)(1)(A).

**B. Respondent's Affirmative Defenses Fail**

Because Petitioner established a *prima facie* case for LH's return, the burden now shifts to Respondent to establish that one of the Convention's affirmative defenses applies. *Padilla*, 850 F.3d at 175. As previewed *supra*, Respondent advances the following affirmative defenses: (1) consent and acquiescence; and (2) grave risk. The Court addresses each in turn.

1. Consent & Acquiescence

"Respondent bears the burden of establishing consent or acquiescence by a preponderance of the evidence." *Id.* (citing 22 U.S.C. § 9003(e)(2)(B)). Consent and acquiescence are two distinct and analytically discrete affirmative defenses. *Id.* (citing *Baxter*, 423 F.3d at 371). "Whereas the consent defense concerns the petitioner's conduct before the contested removal or retention, the acquiescence defense concerns whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* (internal citations omitted). Although both defenses "turn on the petitioner's subjective intent," they differ materially in the degree of formality required to establish that intent. *Id.* at 175–76. Consent may be inferred from either formal or informal conduct demonstrating actual agreement before the removal or retention. *Id.* at 176. Conversely, acquiescence is subject to a heightened formality requirement: "to find acquiescence [courts] look to evidence such as testimony in a judicial proceeding, a convincing renunciation of rights, or a

consistent attitude over a significant period of time." *Id.* (citing *Darin v. Olivero-Hufman*, 746 F.3d 1, 16 (1st Cir. 2014)).

Neither defense is supported by the record in this case. The Court first addresses consent and then turns to acquiescence.

*a. Consent*

Respondent's consent defense warrants little discussion because consent is limited to "what the petitioner contemplated and agreed to, as well as the nature and scope of consent, including any conditions or limitations." *Padilla*, 850 F.3d at 176 (citing *Darin*, 746 F.3d at 15); *see also Hundur*, 2026 WL 1004262, at *6 (explaining that consent requires "some indication that the petitioner approved of the child's **permanent** relocation" (emphasis added)). Here, it is undisputed that Respondent "told [Petitioner] and his mother that she and [LH] were **visiting** the United States for about three weeks and then returning to New Zealand." SUD ¶ 12 (emphasis added). Petitioner's consent therefore extended only to a temporary visit, not a permanent relocation. Respondent's now-admitted private "intention of relocating along with LH permanently in the United States," ECF No. 32 at 12, fell outside the scope of that consent. Petitioner cannot be said to have consented to a permanent relocation that was never disclosed to him.[8]

*b. Acquiescence*

Respondent's acquiescence defense likewise fails. The present record is devoid of any formal conduct amounting to acquiescence under the Hague Convention because "Petitioner has

[8] Respondent nevertheless contends that Petitioner understood her trip to be permanent because he purchased one-way tickets for Respondent and LH. ECF No. 38 at 4. But Petitioner maintains that he routinely purchased one-way tickets for the family's travel to the United States, and he has produced receipts corroborating that practice. ECF No. 46 at 2. The Court finds that, whatever the reason for the one-way airfare, the balance of the record reveals that Petitioner consented to only a temporary trip. Petitioner consistently demanded that LH be returned to New Zealand, and, at most, agreed that LH could remain in the United States for a few months. *See supra* n.6. Accordingly, Respondent has not established that Petitioner consented to anything beyond a temporary stay in the United States.

made no formal statement renouncing his rights or agreeing to [LH's] retention in the United States[; n]or has Respondent provided that Petitioner's actions amount to a 'consistent attitude of acquiescence over a significant period of time.'" *Schwaneberg*, 2024 WL 5010144, at *20 (quoting *Baxter*, 423 F.3d at 371). The record points in the opposite direction: throughout the relevant period, Petitioner consistently maintained that LH should return to New Zealand.

Indeed, Petitioner initially agreed to only a three-week trip to the United States and thereafter authorized an extension to last no more than nine months. And throughout this period, Petitioner remained adamant that LH be returned to New Zealand. *See, e.g.*, ECF No. 22-3 at 5–7, 10, 13, 24–25, 34 (reflecting communications spanning from August 2025 through January 2026 that clearly indicate Petitioner's expressed desire for LH to be returned to New Zealand).[9] And while some messages indicate that the parties discussed an arrangement wherein LH splits time between the United States and Australia, *see id.* at 13 ("I'd really like us to talk this through and reach a shared decision and consensus. Once we've decided on the way forward, the next steps would include packing up [the New Zealand home] and sending items to the new location through regular shipping."); *see also id.* at 20 (October 13, 2025 text message in which Petitioner asks "Can LH spend a Christmas on each side of the world, year by year"), no formal agreement is alleged to have been reached. And such isolated messages do not amount to acquiescence. *Schwaneberg*, 2024 WL 5010144, at *20 ("When seeking a possible waiver of custody rights,

[9] Notably, Respondent represents that in July of 2025, Petitioner stated that "there was 'no point in [Respondent] returning to New Zealand because [Petitioner] was busy working and had little time available for LH[,]" which, in Respondent's view "clearly shows that immediately upon LH arriving in the United States with [Respondent], [Petitioner] showed no interest in making [Respondent] return to New Zealand." ECF No. 32 at 8. But the quoted communication must be read in context. Upon the Court's review of the record, it appears that Respondent is quoting—and misrepresenting—Petitioner's July 27, 2025 text message. Petitioner's message did not convey acquiescence to LH's permanent relocation to the United States; he stated only that he would be occupied with work for one month and was amenable to LH remaining in the United States for that time. ECF No. 22-3 at 2. Indeed, Respondent even acknowledged in response that such an extension would amount to only "a temporary visit." *Id.* Read in full, the message reflects, at most, Petitioner's willingness to extend the temporary stay for a limited period only.

'[e]ach of the words and actions of a parent during the separation are not to be scrutinized.'" (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996)). That is especially so where, as here, they are outweighed by the balance of the communications in the record, in which Petitioner repeatedly demands for LH's return.

Notwithstanding Petitioner's constant pleas for LH's return, Respondent made clear that she desired to remain in the United States with LH. For example, in late-July 2025, shortly after Respondent arrived in the United States, she expressed that she wanted "to live on this side of the world. I've done 10 years on that side. I've tried everything the last year to make it work" and asked if Petitioner would "let her live" in the United States. *See* ECF No. 22-3 at 1. Then, in mid-August 2025, Respondent floated the idea of securing an apartment and enrolling LH in daycare; Petitioner flatly rejected these proposals. *Id.* at 5–7 (notably, Petitioner responded emphatically, stating "NO NONONONO," and asked Respondent to "please book a flight" back to New Zealand). Nevertheless, despite Petitioner's initial resistance, he eventually compromised and supported Respondent enrolling LH into daycare and entering a residential lease for no more than nine months. But, in doing so, he unequivocally communicated this would be a "trial period" and that he did "not consent to the permeant relocation of LH to the United States." *Id.* at 17. Petitioner's willingness to accommodate Respondent's desire for an extended stay and his agreeing to LH's participation in standard childcare systems, while simultaneously asserting and/or seeking to affirm that such stay was only for a limited duration, does not amount to acquiescence for under the Hague Convention.

Respondent disagrees, characterizing Petitioner's financial support and involvement in helping Respondent select an apartment and preschool as acquiescence. *E.g.*, ECF No. 38 at 7, 8. Respondent also contends that Petitioner's post-relocation visits to the United States, during which he explored different suburbs in the Richmond area, discussed purchasing a home in Richmond,

and did not demand LH's return, together with his purchase of certain gifts including an air fryer, large toys and a pet fish, and shipment of certain items from New Zealand to the United States, including certain clothes, accessories and Christmas decorations, constitutes acquiescence. ECF No. 41-1 at 6, 12. Put differently, Respondent invites this Court to conclude that a petitioning parent who continues to support and provide for their child amidst a disputed removal and retention thereby acquiesces to that retention—a proposition that conflates parental responsibility with acquiescence to the child's continued absence. Federal district courts across Virginia have declined that invitation. *See Hundur*, 2026 WL 1004262, at *8 (finding no acquiescence where the petitioner visited the alleged wrongfully removed child, provided financial support during those visits, assisted in enrolling the child in daycare, swim school, and occupational therapy, inquired into obtaining permanent U.S. residency, established a business in the United States, and discussed a future in the United States with the respondent because "when viewed in context, these actions were more akin to an attempt to work with [the respondent] towards some resolution, rather than an unequivocal acquiescence to [the child] living in the U.S., with or without [the petitioner]"); *see also Schwaneberg*, 2024 WL 5010144, at *21 ("That a parent may provide funds, gifts, clothing, or care for their absent child without acquiescing to their retention in a foreign country stems from the basic premise that a parent's concern for their child's health and wellbeing should not be fatal to their Hauge Convention case."). So, too, does this Court. A contrary ruling would create the perverse incentive for petitioning parents to withhold financial support, guidance, and care from their children for fear that continued parental involvement could later be weaponized as evidence of acquiescence, a result that harms the very person the Convention is designed to protect: the minor child.

The Court additionally rejects Respondent's argument for acquiescence premised on the fact that Petitioner did not discuss LH's return during his visit to see LH and Respondent post-

removal to the United States. Courts are reluctant to construe silence as acquiescence; put differently, a petitioner need not plead for their child's return in each and every communication or else risk acquiescing to the same. *See Leonard v. Lentz*, 297 F. Supp. 3d 874, 892 (N.D. Iowa 2017) ("This Court declines to hold that a petitioner bringing a Hague petition must renew his or her non-acquiescence with every communication in order to preserve the right to seek the return of his or her children."). Thus, the fact that Petitioner did not demand LH's return during his United States visits carries little weight, particularly given his repeated objections elsewhere in the record coupled with his belief that LH would be returned to New Zealand at the conclusion of Respondent's lease.

Respondent's remaining theories likewise do not establish acquiescence. She points to Petitioner's post-removal relocation to Australia, discussions about renting the parties' martial home in New Zealand, and his alleged failure to "move with dispatch to contest [Respondent's relocating LH." ECF No. 32 at 8–10; *see also* ECF No. 38 at 5–12, 33.

Petitioner's move to Australia and consideration of renting the New Zealand home might, viewed in isolation, suggest that Petitioner did not presently intend to reside in New Zealand. But the relevant inquiry is whether he accepted LH's permanent removal to the United States—not whether he himself intended to continuously reside in New Zealand. The record contains no evidence that Petitioner intended for LH to reside permanently anywhere other than his heretofore habitual residence: New Zealand. Indeed, Petitioner had previously spent periods living in Australia while LH remained in New Zealand. His own temporary residence elsewhere therefore says little about whether he acquiesced to LH's changed residence to the United States. In any event, as noted previously, the Convention does not require that the child be returned to the State of habitual residence itself; rather, its targeted outcome is return to the petitioning parent.

Nor does Petitioner's purported delay in filing the Petition amount to acquiescence. Once Respondent filed for custody in January 22, 2026, Petitioner was on unequivocal notice that Respondent did not intend to return LH to New Zealand at the conclusion of the previously agreed-upon temporary stay and residential lease. Petitioner filed the Hague Petition in this Court only two months thereafter. That timing does not reflect delay under the Convention. Article 12 permits a Petitioner to seek return at any time within one year of the wrongful removal or retention, and even after that date, the consequence is merely that the court must engage in assessing whether the child has become "settled" in the new environment—filing after the one-year mark does not constitute *de facto* acquiescence. Hague Convention art. 12. By filing before July of 2026, Petitioner acted within the period the Convention itself allows—and, more importantly, filed promptly after Respondent made clear that LH would not be returned as agreed. On this record, the timing of the Petition cannot be construed as acquiescence.

Taken as a whole, the record shows a parent who repeatedly objected to permanent relocation while compromising over the mechanics and timing of LH's return, and concurrently endeavoring to support and participate in his child's life. The Hague Convention does not view those temporary accommodations, continued support for the child, or efforts to resolve the parties' dispute into acquiescence. Respondent therefore has not carried her burden to demonstrate the same.

2. <u>Grave Risk</u>

Under Article 13(b) of the Hague Convention, the Court "is not bound to order the return of the child" if the respondent can establish by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b); 22 U.S.C. § 9003(e)(2)(A). This "defense is to be narrowly interpreted so that issues that predominantly

relate to what parent is better suited to custody of the child do not subsume the purposes of the Hague proceeding." Hague Convention Guide 133. Indeed, "[f]indings of grave risk are rare[,]" *id.* at 134, and this defense is not "a vehicle to litigate (or relitigate) the child's best interests." *Danaipour v. McLarey*, 286 F.3d 1, 14 (1st Cir. 2002). "To satisfy the exception, the potential risk to a child must be 'grave' or 'intolerable,' rather than 'merely serious.'" *Hundur*, 2026 WL 1004262, at *4 (quoting *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007)).

Respondent argues that summary judgment is inappropriate because factual disputes remain concerning whether Petitioner poses such a risk to LH. ECF No. 38 a 30. Her theory rests on allegations that Petitioner is financially controlling and coercive, has engaged in angry verbal outbursts due to his "explosive temper", has thrown dishes or furniture and punched a wall, and has experienced mental-health difficulties[10] and suicidal ideation, sometimes in the presence of LH. *Id.* Respondent also relies on Petitioner's conduct during this litigation, including allegations that he repeatedly called her and yelled at her over the phone. ECF No. 43-1 at 1–4. Based on those allegations, Respondent contends that a genuine dispute of material fact exists as to this issue, and she is entitled to "obtaining a psychological evaluation of [Petitioner], obtaining an evaluation of LH to determine the effects on him of what he witness[ed] from his father's violent outbursts and suicide threats, and allow[] each side to retain experts to opine on whether Mr. Harpur exhibits the characteristics of a coercively controlling parent and whether sending LH to him would pose a risk of grave harm to LH." ECF No. 38 at 32.

Even accepting Respondent's allegations as true—that Petitioner is a "coercively controlling parent" with mental health struggles—they do not establish grave risk to LH within the meaning of Article 13(b). The cases upon which Respondent relies illustrate the difference. *See*

[10] Respondent represents that Petitioner "was diagnosed with bi-polar personality disorder in his 20s when he was having serious delusions and uncontrollable anger problems." ECF No. 38 at 18 (citing Loveland Aff. ¶ 67).

ECF No. 38 at 30–32. In *Walsh v. Walsh*, the petitioner had subjected the respondent to years of "bloody and severe" physical abuse, often in front of the children, had assaulted his adult child, and had previously threatened to kill a neighbor. 221 F.3d 204, 220 (1st Cir. 2000). In *Louis v. Charles*, the petitioner physically abused the respondent in front of the minor child—including while she was holding the child—and made death threats against them both. 831 F. Supp. 3d 94, 105–07 (D. Mass. Apr. 29, 2026). And in *Acosta v. Acosta*, the petitioner threatened to kill the children and himself, threatened to kill the mother and her family, shoved one child, and assaulted the mother in the children's presence. 725 F.3d 868, 875–76 (8th Cir. 2013). Each of these cases follow the same pattern: they involve sustained or severe violence, threats or death, or violence directed towards a child. The allegations here are materially different.

Respondent does not allege that Petitioner has physically harmed LH (or her, for that matter). Rather, she relies exclusively on verbal abuse, coercive behavior, and isolated episodes of anger, many of which occurred before LH's birth. Article 13(b) demands more than proof that a parent has behaved abrasively, erratically, or reprehensibly towards the other parent. There must be clear and convincing evidence that the child's return would actually expose the child to a grave risk of physical or psychological harm. Even assuming Respondent's proposed discovery would further shore-up her contentions regarding Petitioner's mental health and behavioral patterns, Respondent does not meet that demanding standard, and case law from this District and beyond illustrate the difference. *See Hundur*, 2026 WL 1004262, at *5 ("In sum, [the respondent] has presented evidence that [the petitioner] sexually assaulted her prior to AH's birth, grabbed her wrists after AH's birth, hit her with a rolled t-shirt, and threw glass on the ground. The Court does not condone any of [the petitioner's] actions. But the incidents of violence fall short of the clear history of abuse present in" cases where grave risk is found." (collecting cases)); *see also De Paula Vieira v. De Souza*, 22 F.4th 304, 309 (1st Cir. 2022) (upholding district court's finding of no grave

risk where the petitioner was only "verbally abusive"—notwithstanding the fact that the petitioner "threatened her, broke her phone and forced her to have an abortion" and, on one occasion, "drove in a dangerous manner while continuing to threaten [the respondent] leading to the issuance of a retaining order against [the petitioner]" because "none of the abuse was directed at" the minor child).

Respondent's reliance on Petitioner's mental health and suicidal ideation does not alter the analysis. Although mental illness and suicidal ideation could, in certain cases, contribute to grave risk of harm, the present record fails to demonstrate how such considerations produce a grave risk to LH in this matter. Indeed, suicidal ideation unaccompanied by physical violence does not meet the grave risk threshold. *Compare Ciampa v. Nichols*, 2025 U.S. Dist. LEXIS 28638, at *46–47 (C.D. Cal. Feb. 18, 2025) (finding no grave risk despite "brief periods of suicidal thoughts" because there was "no credible evidence of harm to the child" given the absence of typical circumstances common in grave risk cases), *with Garner v. Harris*, 641 F. Supp. 3d 343, 361 (E.D. Tex. 2022) (finding grave risk where petitioner previously attempted suicide in front of his children, threatened to murder his family, had a pattern of violent outbursts and controlling behavior, mental instability, and history of drug and alcohol abuse).

Nor does a history of mental health treatment, standing alone, justify an inference of grave risk. As *Richman v. Vergara* recognized, treating mental health struggles as evidence of grave risks gives judicial gloss to the stigmatization of mental health—an invitation the Court rejects. 540 F. Supp. 3d 1246, 1289 (S.D. Ga. 2021) (While a parent's mental illness could no doubt pose a grave risk to a child in an extreme case, an allegation that a [parent] somehow poses grave risk to [their] child simply because [he or she] sought mental health treatment in the past only perpetuates the unfortunate stigmatization associated with such medical care, which the Court hopes was abandoned years ago."). Relatedly, Respondent's discovery demands put the cart

before the horse. Respondent desires to probe into Petitioner's mental health condition without first demonstrating that Petitioner's mental health condition actually imposes a risk of harm to LH. Indeed, the record is devoid of any evidence—let alone clear and convincing evidence—that Petitioner's mental illness exposes LH to grave risk of harm or an otherwise intolerable situation. Respondent contends that Petitioner has been unstable for at least the last four years, ECF No. 38 at 19, but such allegation undermines her grave risk argument because such "instability" does not include acts of physical violence or behavior akin to cases wherein grave risk was found.

Respondent's coercive control argument is likewise unavailing. ECF No. 41-1 at 31–33. Respondent cites no case law (nor is the Court aware of any) where allegations of coercive control unaccompanied by physical abuse were sufficient to demonstrate grave risk. Indeed, the case law appears to swing the other way. *E.g., Stanley v. Stanley*, 2026 WL 836838, at *11 (D. Vt. Mar. 26, 2026) ("Although Respondent alleges financial abuse, no court has apparently recognized a 'grave risk of harm' on this basis."); *see also Grano v. Martin*, 443 F. Supp. 3d 510, 543 (S.D.N.Y. 2020) ("Respondent has failed to identify a single case in which a petitioner's psychological abuse of a respondent was, on its own, enough to establish that *their child* was at grave risk of future physical or psychological harm." (emphasis added)).

Accordingly, even crediting Respondent's factual allegations, Respondent does not present clear and convincing evidence sufficient to support a finding that returning LH would expose him to a grave risk of psychological or physiological harm or otherwise place him in an intolerable situation. As discussed above, each of Respondent's arguments concerning Petitioner's mental health, suicidal ideation, and coercive control fails in the absence of any indication that Petitioner has ever been physically violent towards LH, Respondent, or anyone else. Nor does the Court's calculus change when considering these arguments collectively. Taken together, they still do not bridge the gap between circumstances alleged and the grave-risk standard imposed by the

Convention, particularly given that Respondent must establish this narrowly construed defense by clear and convincing evidence.[11]

Moreover, even assuming *arguendo* that Respondent had made the required showing, the Court could impose appropriate undertakings designed to mitigate any identified risk and facilitate LH's safe return. *See Walsh*, 221 F.3d at 219 ("Given the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows for the achievement of the goals set out in the Convention while, at the same time, protecting children from exposure to grave risk of harm.").[12]

## IV. CONCLUSION

Based on the foregoing, the Court finds it proper to enter summary judgment in favor of Petitioner and so to order LH's return to his country of habitual residence, New Zealand, for an ultimate custodial decision to be rendered by the relevant local court. *Abbott*, 560 U.S. at 9 (citing Hague Convention, art. 19).

An appropriate Order shall issue.

/s/ RCY
Roderick C. Young
United States District Judge

Date: September 8, 2026
Richmond, Virginia

---

[11] Respondent argues that "[o]ne cannot say there is no grave risk to LH simply because [Petitioner] has not physically hit or sexually abused a family member." ECF No. 38 at 19. The Court agrees that physical abuse is not a prerequisite to a grave-risk finding. But where, as here, the record is devoid of any physical violence toward LH, Respondent, or anyone else, allegations of nonphysical misconduct must still be supported by evidence clearly and convincingly demonstrating that returning LH would expose him to a grave risk of serious harm. That showing cannot be made on the present record as a matter of law. To hold otherwise would dilute both the Convention's heightened evidentiary burden and its directive that the grave-risk defense be narrowly construed.

[12] The Court is not persuaded by Respondent's representation that New Zealand law enforcement would be incapable of ensuring LH's safety, even if it were to credit her grave risk argument. Loveland Suppl. Aff. ¶¶ 93–94.